# Staunton.

## WILSON BROTHERS AND GEORGE H. HOLMES V. WILLIAM J. BRANHAM AND WILLIAM M. PHIPPS.

### September 28, 1921.

### Absent, Prentis and Burks, JJ.

1. TREES AND TIMBER—*Absolute Conveyance of Timber—Unlimited Time for Entry and Removal—Public Policy.*—The owner in fee of lands producing standing timber may make an absolute conveyance of such timber, with unlimited time for entry and removal of the same. It is incident to the rights of the owner of the fee that such owner may do what he will with his own, unless his intended disposition is contrary to public policy, or to some positive rule of law. And neither public policy nor a positive rule of law forbids such absolute conveyance.

2. ESTATES—*Creation of Several Estates.*—The right of an owner to carve out of his property as many estates, or interests (perpendicular or horizontal, perpetual or limited), as it may be able to sustain, cannot be open to doubt.

3. TREES AND TIMBER—*Standing Trees Realty—Interest in the Soil.*—Standing trees are realty, and if the owner of lands grants the trees growing thereon to another and his heirs, with liberty to cut and carry them away at his pleasure forever, the grantee acquires an estate in fee in the trees, with an interest in the soil sufficient for their growth, while the fee in the soil itself remains in the grantor.

4. INTERPRETATION AND CONSTRUCTION—*Whole Instrument Taken Together—Conflicts Reconciled.*—In the interpretation of instruments the whole instrument must be taken together, and, if possible, apparent conflicts between different portions of the same are to be reconciled so as to make the instrument, and every part thereof, conform to, and be in harmony with, the manifest general intent.

5. TREES AND TIMBER—*Conveyance of Timber with Stipulation for Removal Within Specified Time—When Title Passes.*—Under a contract allowing a person to cut and remove standing timber within a time specified, the absolute title to the timber never

passes out of the grantor until the grantee cuts and removes
the timber within the time specified in the contract. There is
no forfeiture of the timber remaining uncut or unremoved after
the time limit, for there is nothing to forfeit.

6. TREES AND TIMBER—*Construction of Timber Deed—Reverter—
Unlimited Time for Removal of Timber—Case at Bar.*—The
granting clause of a deed was to the effect that the grantor
"sells, grants, and conveys to the grantee, or his assigns, for a
valuable consideration, and with general warranty, 1,286 stand-
ing and branded white oak trees, growing on certain lands,
with the right to enter on said land at any time, to cut and
remove said trees, or their products." The deed contained a
further clause that the grantee was to have ten years in which
to cut and remove the trees from the land, and that if he failed
so to do within ten years, then the grantor should "have the
right to deaden such of said trees as may be standing upon said
land, which the owner may clear for cultivation." Very little
of the land on which the timber stood was suitable for farming
purposes, and the chief value of the land consisted in the
standing timber for which there was no immediate market,
owing to lack of transportation facilities.

*Held:* That the deed conveyed a fee in the trees, with no time
limit on the right of removal.

7. REAL PROPERTY—*Necessity of Deeds—Disclaimer of Title.*—Where
the legal title is vested in one, no mere parol disclaimer can
divest title. It has been long settled here that disclaimer of a
freehold can only be by deed, or in a court of record.

8. TREES AND TIMBER—*Sale of Timber—Abandonment of Contract.*—
In the instant case it was contended that defendants, the owners
under a contract of certain timber rights, had abandoned their
rights under the contract. The affirmative evidence of aban-
donment was far from satisfactory. The direct testimony of
one of the defendants that the contract had never been aban-
doned was corroborated by a number of witnesses, and apart
from this direct testimony, it was in the highest degree unlikely
that the defendants ever entertained any intention of abandon-
ing the contract and their rights.

*Held:* There was no abandonment.

Appeal from a decree of the Circuit Court of Dickenson
county. Decree for complainants. Defendants appeal.

*Reversed.*

The opinion states the case.

*Sale & Harris* and *Chase & McCoy,* for the appellants.

*O. M. Vicars, Geo. C. Peery, Jno. W. Flannagan, Jr., A. A. Skeen,* and *Phipps & Phipps,* for the appellees.

SAUNDERS, J., delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of Dickenson county, pronounced October 15, 1919. The main question presented for determination is the proper interpretation and true construction of a deed made by Felix Senter, M. L. Senter and Winnie Senter, his wife, A. C. Senter and M. J. Senter, his wife, to Caroline Harris.

The pertinent facts necessary for an adequate understanding of the genesis and development of this controversy are as follows: In the year 1904, M. L. Senter, A. C. Senter and their wives, and Felix Senter, for value received, conveyed certain standing trees in the county of Dickenson to one Caroline H. Harris. This conveyance, so far as is needful, is herewith reproduced:

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"The parties of the first part bargain, sell, grant and convey unto the party of the second part, or assigns, with covenants of general warranty of title, freedom from all encumbrances, and peaceable and quiet possession, the following property, viz: six hundred and forty-three (643) white oak trees twenty to forty inches in diameter, six hundred and forty-three (643) white oak trees over twenty-four inches in diameter. All of said trees containing from twenty-four feet and over of straight trunk, or body, clear of limbs and visible defects, and are branded, or marked, with letter 'H' cut in the bark, and are standing and growing on the land of the said first parties, located on the waters of Cane creek of Pound river, and bounded and described as follows:

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"The parties of the first part grant unto said second party, his heirs and assigns, the right to enter on said land at any time free of charges or damages, for the purpose of cutting, manufacturing and removing said trees or their products from the land, and for that purpose grant unto the party of the second part, or his assigns, the right to build and open all wagon roads, train roads or station roads on, through or over said lands. The parties of the first part grant unto said second party, or assigns, free of cost, the right to erect mills on said land for the purpose of cutting said trees into lumber or into staves. The party of the second part, or assigns, has the right to use free of charge sufficient timber for necessary tramroads on said tract of land, so that no valuable, merchantable timbers shall be used for said tramroads. The party of the second part or his assigns are to have ten years from March 10, 1902, in which to cut and remove said trees from said lands, and if the party of the second part or his assigns shall fail to cut and remove said trees from said land within ten years from March 10, 1902, then the parties of the first part, or the owners of the land, shall have the right to deaden such of said trees as may be standing upon said land, which the owner may clear for cultivation. The said first parties covenant with the party of the second part, that their title to said tract of land is perfect, and that they have a perfect right to sell and convey said trees, together with rights and privileges herein set forth."

The rights, titles and interest derived by Caroline Harris under this deed passed by successive conveyances, until finally they were lodged in W. H. and F. G. Wilson. It will be noted that under the Senter deed relating to the white oak trees on the lands of the Senters, Caroline Harris, the vendee of the Senters, was given the right to enter at any time upon the lands described in her deed, and cut and remove the trees therein conveyed to her. Title to the lands on

which these trees were growing remained in the grantors.
· The bill in this case is filed by W. J. Branham and
William McKinley Phipps. These parties are the grantees
in a deed bearing date September 5, 1917, from Josephine
H. Stanley and John W. Stanley, her husband. W. J. Bran-
ham was the grantee in a deed from the same parties of
date September 4, 1916. This latter deed conveyed to the
said Branham, with general warranty, the standing trees
on the lands of the said Josephine Stanley, the same "being
originally a part of the tract of land of the aforesaid Felix
Senter, and a part of the land recovered by Josephine Stan-
ley in the chancery cause of *Josephine Stanley* v. *M. L. Sen-
ter and others.*" Some of the trees comprehended in this
conveyance, to-wit, 341 white oak trees branded "H", were
a part of the trees embraced in the deed *supra* from the
Senters to Caroline Harris, and are referred to as the Caro-
line H. Harris timber. The timber conveyed by Josephine
Stanley to Branham stood upon land which the said Joseph-
ine owned in fee, but it is not necessary to trace in detail
her title in this respect. Suffice it to say that it was duly
derived. The deed of September 4, 1916, gave the grantee
full right to cut and remove during a specified period the
timber conveyed.

Subsequent to the deed *ubi supra,* Wm. McKinley Phipps
purchased from Branham a one-half interest in the 341
white oak trees branded "H", that is to say the Caroline
Harris timber. Thereafter, on September 5, 1917, the said
Josephine Stanley and her husband, by a deed which re-
cited the trees sold to Branham, and the terms of sale, and
the purchase from Branham by Phipps of a one-half inter-
est in the said 341 trees, enlarged the period within which
the said trees could be removed from Mrs. Stanley's lands
by said Branham and Phipps.

Some time in June, 1919, Branham and Phipps filed a bill
in chancery in the Circuit Court of Dickenson county,

claiming to be the owners of the 341 branded trees aforesaid, and alleging that W. H. Wilson and F. G. Wilson, doing business as Wilson Brothers, and one G. H. Holmes, were cutting and removing said trees. The plaintiffs asked for an injunction restraining the activities of Wilson Brothers and Holmes, also an account of damages. About the time that Branham and Phipps applied for this injunction against Wilson Brothers and Holmes, as recited *supra*, the W. M. Ritter Lumber Company, a corporation, made application for like relief on the same grounds against the same parties. The lumber company claimed that it was seized and possessed of all the trees and timber of every kind on a 100 acre tract, the former property of Josephine Stanley, and traced its title as follows: (1) By deed to said company from O. H. Vicars and wife, George C. Peery and wife, and Columbus Phipps and wife, dated May 29, 1917. This deed conveys to the Ritter Lumber Company, with general warranty, all of the timber of every description on the 100-acre tract, *supra*, with complete rights, etc., of cutting and removing same within a specified period.

Looking to the deeds from Josephine Stanley and husband to Vicars and associates, predecessors in title to the lumber company, it will be noted that the grantors convey to the said Vicars and associates the 100-acre tract in fee, making no reference to the timber on same. These deeds are three in number, bearing date respectively, April 3, 1914, March 15, 1915, and October 14, 1915. The first deed in point of time was made when Josephine Stanley was an infant. The second deed ratifies the deed of April 3, 1914. The deed of October 14, 1915, makes a correction in the description and acreage of the land referred to in the prior deeds. But as stated *supra*, there is no reference to timber in any one of the three deeds, all of which are prior in time to the deed of Josephine Stanley and her husband to Wil-

liam J. Branham. It is not needful to trace in full detail the title of the Ritter Company through Josephine Stanley to Felix Senter. Evidently Vicars, Peery and Phipps, as the owners in fee of the 100 acre tract, claimed to own all the standing timber thereon. The bill of the Lumber Company alleged that Wilson Brothers and Holmes were cutting the standing timber on said 100 acre tract, that is, the Caroline Harris timber, and like Branham and Phipps it asked for an injunction restraining these acts, and an account of damages.

In vacation of the Circuit Court of Dickenson county, on June 2, 1919, a preliminary injunction was awarded in the case of *Ritter Lumber Company* v. *Wilson Brothers and Holmes.* On June 12th, a like order of injunction was entered in the case of Branham and Phipps against the same defendants. The defendants later filed an answer in each of the foregoing cases.

In their answer in the case of *Branham and Phipps* v. *Wilson Brothers and Holmes,* Wilson Brothers claimed the 341 branded white oak trees standing and growing on the lands of Josephine Stanley. They denied that any right, title or interest in these trees passed to the plaintiffs under the deeds from Stanley and wife. Further, the respondents set up their chain of title to said timber and trees, the same being the deed *supra* from the Senters to Caroline Harris, and successive conveyances thereafter, the last in the series being the deed of John Golding and Herbert A. Beard and their wives. By these deeds all the right, title and interest of Caroline Harris in the timber aforesaid passed to and was finally lodged in respondents, the said W. H. and F. G. Wilson. The answer denied that respondents had done anything to lose, or forfeit, the estate and rights derived through conveyances in course from Caroline Harris, or that they, or their predecessors in title, "had ever abandoned said trees or any of them." On the contrary they asserted that they

"had at all times claimed the same, and paid the taxes from year to year on the same, and have at all times asserted, and are now asserting, their ownership of said trees and timber, and the right to cut and remove the same." A like answer was filed in the suit of *Ritter Lumber Company* v. *Wilson Brothers and Holmes*. There are other allegations of the bills and answers, and facts developed by the testimony, that will be referred to in the discussion of the legal questions presented in this case.

After the pleadings were completed in the foregoing causes, voluminous depositions in behalf of the respective parties were taken, and filed, the testimony in the one case being used in the other. Upon the final hearing of the foregoing causes, decrees were respectively entered sustaining the contention of the complainants, and perpetuating the injunctions originally awarded. From these decrees appeals were secured by the defendants, Wilson Brothers and G. H. Holmes, bringing the entire controversy before this court for review.

In the chain of title from Caroline Harris, grantee of the Senters, to the Wilsons is the deed of Beard and Golden, the immediate predecessors in title of Wilson Brothers, to-wit: W. H. and F. G. Wilson. This deed bears date September 10, 1912. Under its authority Wilson Brothers began to cut the Caroline Harris timber in that year, continuing their operations into the year 1913. Holmes was their active agent in the woods. Owing to scarcity of labor and difficulties in transporting the lumber, the work was finally discontinued after a portion of the timber had been cut and at considerable expense floated down Pound river. The trees in question were on Cane creek, an affluent of Pound river. There was no railroad within reach during the foregoing period of operations. Hence, in order to reach their market, the defendants were compelled to float their timber down Cane creek to Pound river, and thence through

the Breaks of Cumberland to the Big Sandy river. This venture proved to be difficult, costly and unsatisfactory. Some years after the discontinuance of the initial operations, Wilson Brothers resumed the cutting of the oak trees on the Stanley tract. This was in 1919. Timber having increased in value in the meantime, and labor become easier, defendants hoped to make their venture profitable. The interruption of these and other operations by the injunctions of the several plaintiffs has been recited.

Complainants allege in their bills respectively, (1) that whatever the original rights of the defendants under the Harris deed, the timber under that deed had reverted to the owners of the land; (2) that if there was no reverter, the defendants had lost title to this timber by abandonment. It is fundamental, therefore, to ascertain the rights of defendants—*i. e.*, the Wilson Brothers,—under the deed from the Senters to Caroline Harris. The inquiry into the charge of abandonment will follow in due course.

The contention of the appellants is, (a) that the Senter deed conveying the timber to Caroline Harris, conveyed an absolute estate in the timber, unlimited as to time of removal, with the right to the grantors, or to the then owners of the land, at the expiration of a period of ten years from March 10, 1902, to deaden such of said trees as might then be standing on land which the owners desired to clear for cultivation; (b) that if this contention is not sound, then the grantee in said Senter deed had a reasonable time after the expiration of the ten year period, within which to cut and remove said trees, and that such reasonable time had not elapsed when the defendants were restrained by the orders of court *supra*.

The appellees specifically insist that under the Senter deed Caroline Harris had a period of ten years from March 10, 1902, within which to cut and remove the trees from the land in question, and that any trees uncut and unremoved

at the expiration of said period, became the property of the grantors, their grantees and assigns; further, that if this contention is not well taken, and it is considered that after the expiration of the ten year period the said Harris was entitled to a reasonable time thereafter within which to cut and remove said trees, such reasonable time had elapsed before Wilson Brothers began their operations in 1919.

There are two noteworthy clauses in the Senter deed; (a) "The parties of the first part grant unto the second party, his heirs and assigns, the right to enter upon said land at any time, * * * for the purpose of cutting, manufacturing and removing said trees, or their products, from the land, and for that purpose grant unto the party of the second part, or his assigns, the right to build and open all wagon roads, etc."

(b) "The party of the second part, or his assigns are to have ten years from March 10, 1902, in which to remove said trees from said lands, and if the party of the second part, or his assigns, shall fail to cut and remove said trees from said land within ten years from March 10, 1902, then the parties of the first part, or the owners of the land, shall have the right to deaden such of said trees as may be standing upon said land which the owner may clear for cultivation."

The primary inquiries in this case are, (1) whether it is possible for parties to make a contract whereby one would be entitled to a perpetual right to enter upon the lands of another, and remove timber therefrom; (2) if such a contract is possible, did Caroline Harris secure a right of that character under her deed from the Senters?

[1, 2] There seems to be no sufficient reason why the owner in fee of lands producing standing timber should not be able to make an absolute conveyance of such timber, with unlimited time for entry and removal of same. "The right

of an owner to carve out of his property as many estates, or interests (perpendicular, or horizontal, perpetual, or limited), as it may be able to sustain, cannot be open to doubt."

It is incident to the rights of the owner of the fee, and in line with well established policy which allows the free and untrammeled disposition of estates, that such owner may do what he will with his own, unless his intended disposition is contrary to public policy, or to some positive rule of law. We know of no public policy, or rule of law, which forbids the owner of standing timber to convey an absolute estate in such timber, with an unlimited time for removal. The whole matter rests in the intention of the parties, and if it is clear that the owner intends to give such an estate, and the language used is adequate to that end, it is not for the courts to concern themselves with the wisdom, or unwisdom, of the owner's action. There are many cases supporting this power of disposition of the owner of lands over his standing timber, and so far as we are aware, there are none that deny it. A few authorities directly in point will be cited in this connection.

In *Hicks* v. *Phillips*, a Kentucky case, the grantor conveyed certain real property by deed containing the following clause: "Said Phillips (the grantor) reserves the timber (on described land), also the rails made, and cut timber for rails lying on said land." The heirs of the grantee brought a bill to quiet title, setting forth that more than thirty-seven years had elapsed since the above reservation, during which time appellees had failed to take any steps to remove the timber, and that a forfeiture by reason of failure to remove had taken place. The court said: "On the whole, the correct rule is laid down in *Patterson* v. *Graham, supra,* where it is held that one may buy growing timber with no intention of manufacturing it, and may hold it, just as he may hold the land, if he so frames his contract; but where the parties intend that the timber shall be severed from the

land, and no time is fixed therefor, the law implies that the grantee will remove it in a reasonable time. So too the vendor of land may wish to reserve the timber thereon, not with a view of cutting and removing it, but with a view of its ultimate enhancement in value, when proper transportation facilities afford him a market. If so, he should be permitted to contract accordingly. But it is insisted that this will impose a heavy burden upon the vendee of land by defeating for an indefinite period of time the culture and improvement of the soil. If so, it will be a burden that he knowingly and voluntarily assumes. However, we apprehend that in the great majority of cases, the burden will be more imaginary than real, for ordinarily the fact that the timber may be stolen, or destroyed by decay or fire, or storm, or may be lost in some other way, will be a sufficient incentive to the owner not to postpone indefinitely its severance from the soil." *Hicks* v. *Phillips,* 146 Ky. 305, 142 S. W. 394, 397, 47 L. R. A. (N. S.) 878.

In *Clapp* v. *Draper,* a Massachusetts case, the following state of facts is revealed: A tract of land was conveyed to Stephen Fowler, grantee. Thereupon, the grantee reconveyed to the "grantor, his heirs and assigns, all 'timbers and trees' growing and standing on said land forever, with full right to cut and carry away said trees at all times at their pleasure forever." The owner of the land cut and carried away some of these trees, and the owner of the trees thereupon brought trespass. The court held: "The result of this joint construction is that the grantor conveyed the close to the grantee in fee, reserving to himself an inheritance in the trees and timber, not only then growing, but which might thereafter be growing in the close. This is the natural effect of the grantee's agreement that the grantor and his heirs should have all the trees and timber standing and growing on the close forever, and not merely those then standing, or which should be standing

within a limited time, and of a perpetual license to cut and carry them away. The plaintiff having all the estate in the trees, timber and close, which the grantor had, after the execution of these two deeds, he has an inheritance in the trees and timber, with an exclusive interest in the soil, so far only as it may be necessary for the support and nourishment of the trees." *Clapp* v. *Draper*, 4 Mass. 266, 267, 3 Am. Dec. 215-16.

In *France* v. *Deep River Logging Co.*, the court was asked to construe certain language giving to one Mooers and his assigns "the right to enter upon a tract of land, and remove certain timber and trees therefrom at the pleasure of the grantee, his heirs, personal representatives and assigns, forever." Held, that this language pointed "conclusively to an intention on the part of the grantor to convey a continuing perpetual right, for all time, to enter upon the land and remove the timber. The grantees, or assigns, or descendants, may do so one hundred years hence. Grants in substance the same as this have been held to have such effect." *France* v. *Deep River Logging Co.*, 79 Wash. 336, 140 Pac. 361, Ann. Cas. 1916-A 238.

In the case of *Lodwick Lumber Co.* v. *Taylor*, the grantor "bargained, sold and released unto the grantee, heirs and assigns forever, in fee simple, * * *. all the timber on certain lands," with general warranty. Held: "The deed unmistakably expresses the intention to convey the timber as an interest in the land on which it stood, and to convey it in fee simple, and forever. It is a well settled proposition that trees may be so conveyed, and reserved in a deed, as to leave in one person a title in fee in the soil generally, and in another a like title in the timber. * * * The very terms of the deed, when it says the title is conveyed in fee simple forever, answer any questions that might otherwise arise as to the nature and duration of the right granted. *Lodwick Lumber Co.* v. *Taylor*, 100 Tex. 270, 272, 98 S. W. 238, 239, 123 Am. St. Rep. 805.

The following citation is taken from the opinion of the court in the case of *M. R. Cobham Realty Co.* v. *Donlan:* "In its essentials Deed A, conveying the timber, with the right to cut and remove the same, differs not from a *grant,* or *reservation* of *coals,* or *minerals,* with a similar *right of entry to mine, or remove.* (Italics supplied.) That such a grant, or reservation, couched in the terms employed in Deed A, would be absolute, no one would deny; and if in fact McGrath did for the consideration paid grant such an estate in the timber with right of entry for cutting, skidding and removing the same, as long as any of it remained, we hazard the opinion that apter words to express that intention could not have been chosen than those which were actually employed. * * * Owners of property have the right to be foolish, as well as wise, prodigal as well as provident; and whichever they are, it is the business of the courts to enforce their contracts freely made and plainly expressed." *R. M. Cobham Realty Co.* v. *Donlan,* 51 Mont. 58, 67, 149 Pac. 484, 487.

In *Magnetic Ore Company* v. *Marbury Lumber Company,* which was a controversy concerning the estate taken in standing timber, the court said: "The title passed to the purchaser, and we see no reason for giving to words used in a deed of conveyance of trees a different meaning than that given when used in a deed of conveyance of minerals, or any other portion of the realty, there being nothing in the instrument to control or vary their usual signification." *Magnetic Ore Co.* v. *Marbury Lumber Co.,* 104 Ala. 465, 470, 16 So. 632, 633, 27 L. R. A. 434, 435, 53 Am. St. Rep. 73.

In *Baker* v. *Kenney,* the following language was construed: " * * * do grant and convey to the party of the second part, his executors, administrators and assigns, all timber and growth of timber on said land. To have and to hold to the said party of the second part, his executors, ad-

ministrators and assigns forever, with the privilege at all times to enter said lands for the purpose of cutting and hauling the timber therefrom." Said the court: "The language of the instrument before us indicates that the parties contemplated the right on the part of the defendant, his administrator, or assigns, to take timber and growth of timber from the described land. There is not only a failure to fix a time limit, but the *habendum* clause expressly described the right as one which was to exist forever. It is true that in neither the granting clause, nor the *habendum*, are the heirs of the grantee mentioned, and at common law the grant would be construed to be for life only. But in this State the term heirs, or other technical terms, or words of inheritance, are not necessary to create and convey an estate in fee simple." (This is also true in Virginia.) "If a grantor desiring to prepare an instrument which would convey to the grantee a fee simple title to the incorporeal hereditament described in the instrument as the right to take timber and growth of timber from designated land, should attempt to frame a deed for the purpose, he could not, having regard to the laws of this State, do so in apter words than those used in the instrument before us, and we reach the conclusion that such was his purpose." *Baker* v. *Kenney*, 145 Iowa 638, 645, 124 N. W. 901, 904 (139 Am. St. Rep. 456).

In *Butterfield Lumber Co.* v. *Guy*, the following language was construed, the plaintiff claiming that the timber had reverted by reason of the failure to remove same within a reasonable time: "We convey and warrant to the grantee all the green pine timber on the lands designated. We further convey the right to enter upon said land with log cars and log wagons to remove said timber off said land." This deed was made in 1892, and the suit claiming a reverter of the standing timber was brought in 1906. The court held as follows:

Opinion.

"The deed is a simple conveyance by warranty in fee simple of the timber, without time limit, or conditions. In every essential necessary to convey a fee simple interest in the trees, the deed conforms to the requirements of the statutes. * * * 'No question of public policy is involved in this deed so as to avoid it. The owner of the land was the owner in fee, and he might carve it up into as many different sorts of estates as the land was susceptible of, and make a good and valid deed in fee simple to each. If he has done so and finds it inconvenient or improvident, the courts will not destroy the property rights of the vendees in order to relieve him from his own improvidence, * * *.'

"The practical effect of the bill is to ask the court to write into the deed what is claimed was the intention of the parties as to the legal consequence of the contract made, though the instrument itself is silent as to any such intention. If the conditions to be engrafted on this contract by the complainant are to be put there, it must be done by the court writing into the deed for the benefit of one of the parties, a clause which is at variance with his own contract, and destructive of the property right of the other party, which property was bought from, and consideration paid to, the party asking to have same cancelled. The interest of the purchaser of this timber under his deed has no less claim to the protection of the law than the interest which the seller retains in the soil. The seller of this timber under his deed has no less claim to the protection of the law than the interest which the seller retains in the soil. The seller of this timber seeks to have the court do that which is in plain conflict with the rights which he has conveyed. By warranty deed he has sold this timber, received money for it, and now seeks to breach his own warranty by a proceeding in an equity court to cancel his deed, and declares that his vendee did not get what he warranted him he would convey. There is no justice, or

equity, in the contention. If he desired to limit the title which he conveyed, he should have placed it in the contract. If it had been his purpose to grant him a license merely to enter the land and cut the trees, his contract should have been drawn so as to express this intention. Not having done so, it is not for us, at his instance, to give to his contract an intention which deprives the vendee of his property, and is contradictory of the terms of the deed made by the vendor." *Butterfield Lumber Co.* v. *Guy,* 92 Miss. 361, 46 So. 78, 15 L. R. A. (N. S.) 1123, 131 Am. St. Rep. 540.

In the case of *North Georgia Co.* v. *Bebee,* the grant of certain standing, branded trees was in the following language: " * * * doth grant, bargain, sell and convey (*i. e.,* said trees) to the party of the second part, his heirs and assigns forever, * * * with the full and unreserved right of way, etc., for the manufacture or removal at any time of any and all timber," etc. The conveyance was with general warranty. A claim of reverter was asserted in this case on the ground of failure to cut and remove within a reasonable time. The court held:

"The paramount consideration in the construction of every instrument conveying growing trees with the right to cut and remove them, is the intention of the parties as contained in the writing. If that intention be a sale and purchase of the trees, to be held as land with a perpetual right of entry to remove them, the vendor is estopped by his own grant from compelling the vendee to cut and remove the trees at his own will, or even within a reasonable time."

"It will be observed from the reading of the deed appearing in the statement of facts that the grant of the estate in the trees is absolute and unconditional. It is to the party of the second part, his heirs and assigns forever. * * * These various privileges granted to the vendee would seem to be

rather a recognition of the grant of an unconditional estate in the trees, than a limitation upon the estate. The grantee's right of entry for the purpose of manufacturing or removing the timber was not limited, but the privilege was indefinite, or, to use the words of the grantor, he could exercise the right '*at any time.*'" (Italics supplied.)

"If it is possible to frame a conveyance creating an estate in trees, with a perpetual right of entry to cut and remove them from the land, this deed has that effect. It may bear harshly upon the owner of the soil, but as it was competent for him to make such a contract as this, he must abide the consequences of his own deed." *North Georgia Co.* v. *Bebee,* 128 Ga. 563, 57 S. E. 873, 874.

A case singularly in point is the case of *Shepherd* v. *Bank of Montreal.* The deed in question contained the following clause: "* * * and the party of the second part is given the period of six years from and after this date in which to remove said trees from said lands. But if the party of the second part should desire to have said trees stand on said land for a longer period than six years, he shall have the right to let said trees stand on said land until he shall desire to remove them, except that the party of the first part shall, after the expiration of said period of six years, have the right to deaden such trees as stand on land where the said party of the first part desires to clear and cultivate, first giving the second party, or his assigns, twelve months personal written notice to remove said trees off said land where the party of the first part desires to cultivate."

In this case, too, the question of reverter arose, but the contention to that effect was overruled. The following citation is from the opinion of the court: "Defendant's position is that the title has reverted to him by reason of the failure on the part of the plaintiffs, and those through whom it claims, to cut and remove the timber within six years from the date of sale, or within a reasonable time

thereafter. In our opinion neither one of these propositions can be maintained. By the very deed which the defendant executed, the grantee is not only given six years within which to remove the trees, but the further right after that time to let the trees stand on the land until he desires to remove them, subject, however, to the right of the grantor to deaden the trees after first giving the grantee twelve months' personal notice to remove the trees 'off the land where the grantor desires to cultivate.' True, we have held that where the contract of the sale of standing timber is silent on the question of removal, but the situation of the parties and the circumstances surrounding them at the time the contract is executed are such as to show that the severance of the timber from the soil was contemplated, the title thereto may be defeated by a failure to cut and remove the timber within a reasonable time. * * * But the rule has no application to a case where the time for removal is fixed by the parties. In other words, it does not prevent the parties from agreeing on the time for removal. There can be no doubt that a party can buy standing timber with no intention of manufacturing it, and may hold it just as he might buy or hold land, if he so frame his contract. * * * Here the trees were conveyed by deed to the grantee, *his heirs and assigns* (italics supplied), with covenant of general warranty. * * * The parties not only agreed that the trees should remain on the land for six years, but for so long thereafter as the vendee desired. Under these circumstances, the trees passed as realty, and the covenant of title would follow into the hands of any vendee." *Shepherd* v. *Bank of Montreal*, 156 Ky. 495, 497, 161 S. W. 214, 215.

It abundantly appears from the cases cited, and from many others that might be cited, and it is in full accord with fundamental principles, that it is competent for an owner of lands to create an absolute estate in standing timber, with a perpetual right of entry to cut and remove same.

Confronted with a given deed alleged to create rights of this character, the question is merely one of construction, and the ascertainment of the intention of the parties.

We have been cited to a number of cases in this State as authority for the contention, (a) That under the deed in question in the instant case, the grantee "was to have only ten years from the 10th of March, 1902, within which to cut and remove the trees sold;" (b) that even if the "grantee should be considered to be entitled to a reasonable time after the expiration of the ten year period to remove said trees, such reasonable time had elapsed at, or prior to, the institution of this suit."

Much reliance is placed by appellees upon the principle announced in the following citation from the case of *Wright* v. *Camp. Mfg. Co.,* 110 Va. 678, 687, 66 S. E. 843, 846.

"In *McRae* v. *Stillwell, supra,* the court says among other things, that 'while it is possible * * * for parties to make a contract whereby one would be entitled to a perpetual right to enter upon the land of another and remove timber therefrom, as such an agreement is so unreasonable in its nature, no contract will be presumed to have this effect unless it is plainly manifest from the terms of the same that such was the intention of the parties.'

"In *Hill* v. *Hill,* 113 Mass. 103, 18 Am. Rep. 455, the court says: 'It is not reasonable to presume that it was the intention of the parties to subject the land to a permanent easement. The right claimed by the plaintiff would deprive the defendant of the full use and enjoyment of his land for an indefinite time, which might extend through his life, and would give the plaintiff for that time the principal, if not the sole, beneficial use of it. * * * The claim of the plaintiff that he had the right to have the trees remain, drawing nourishment from the soil, as long as he chose, is, we think, contrary to the intention of the parties.'" *Id.,* p. 687.

It may be freely conceded that taking a "whole contract together," effect should not be given to any provision which is ascertained to be contrary to the intention of the parties; but whenever the intent of the parties is ascertained from internal evidence, and by proper construction of the instrument under consideration, that intent should be made effective. The timber cases, so-called, in Virginia, rest upon the language construed in those cases, and they announce no principle contrary to the authority of the cases cited *supra.* Indeed, in the citation from *McRae* v. *Stillwell,* 111 Ga. 65, 36 S. E. 604, 55 L. R. A. 513, it is said: "It is possible for parties to make a contract whereby one would be entitled to a perpetual right to enter upon the land of another, and remove timber therefrom, yet" etc.; but the conclusion announced is that. such an agreement is so unreasonable in its nature that "no contract will be presumed to have this effect, unless it is plainly manifest from the terms of the same that such was the intention of the parties."

In deciding the cases cited by appellees, this court assumed the foregoing attitude with respect to contracts alleged to afford an indefinite right of entry and removal. But that attitude and those decisions are not decisive of the instant case, for the manifest reason that the language to be construed in the instant case and in the cases cited is essentially different. For instance, in the case of *Blackstone Man. Co.* v. *Allen,* 117 Va. 452, 85 S. E. 568, this court held that "under a contract allowing a person to cut and remove standing timber within a time specified, the absolute title to the timber never passes out of the grantor until the grantee cuts and removes the timber within the time specified in the contract." This is obviously true. Further, the court held that there was no forfeiture of the timber remaining uncut, or removed after the time limit, for the manifest reason that there was nothing to forfeit.

But in this case the court was dealing with an express and limited right to enter and remove the timber, not an unlimited right. The contractee's rights of every character fell with the termination of the time specified for cutting and removing the standing timber in question.

In the case of *Wright* v. *Camp Mfg. Co., supra,* the deed conveyed all the pine timber standing on the land of a specific diameter, with the right to cut and remove same in five years, and if not cut and removed within that time, then, upon specified terms, such further time of removal as the grantee might desire was provided for. The grantee claimed an indefinite time under the terms of the latter provision. But the court held, taking the whole contract together, that the grantors never intended to confer any such indefinite right upon the grantee, and that "it would be unreasonable to hold" that such an indefinite right was intended to be conferred. This case is more in point as authority for the construction placed by appellees upon the Senter deed to Caroline Harris than any other that is cited, but there are several features of the Senter deed hereinafter to be discussed, and certain attendant distinguishing circumstances which distinguish this case from the *Camp Case.* These features and distinguishing circumstances will presently be considered.

The case of *Brown* v. *Surry Lumber Co.,* 113 Va. 509, 75 S. E. 84, rests upon the case of *Wright* v. *Camp.* The language to be construed was, that the "purchasers should have five years in which to cut and remove the timber conveyed, from the time at which they commenced to manufacture said timber into wood, or lumber, but they shall not be limited as to the time in which they shall commence to cut or remove the same." Construing this somewhat ambiguous language, the court held that the deed on the whole did not show an intention to convey a perpetual right to enter and remove the timber, but that such right must be exercised in a reasonable time.

25

In *Quigley Furniture Co.* v. *Rhea,* 114 Va. 271, 76 S. E. 333, the grantees were given six years in which to cut, fell remove, etc., the timber conveyed. The court held, very properly, that no timber could be removed after the expiration of this period.

*Smith* v. *Ramsey,* 116 Va. 530, 82 S. E. 189, follows *Quigley* v. *Rhea, supra.* The same question was involved.

*Hartley* v. *Reaves,* 117 Va. 219, 84 S. E. 97, and *Blackstone* v. *Allen, supra,* are timber cases, but are no wise in point. *Johnson* v. *Powhatan Mining Co.,* 127 Va. 352, 103 S. E. 703, a recent case, reaffirms the proposition that where one owns the fee in land and another the standing timber thereon, with a right of removal, the owner of the timber should remove the same within a reasonable time unless the contract clearly affords an indefinite and perpetual right to allow the timber to remain unsevered. But the same case affirms the companion proposition, that it is possible to so draw a contract as to give such a perpetual right to the owner of the timber, though a contract should not be construed to "have such meaning, unless the parties clearly so intended, and definitely expressed such intention." With these pronouncements we fully concur.

[3] Reverting now to the Senter deed under consideration, it will be noted that the grantor "sells, grants and conveys to the grantee, or his assigns, for valuable consideration, and with general warranty, 1,286 standing and branded white oak trees growing on certain lands, with the right to enter on said land at any time, to cut and remove said trees, or their products." Standing alone, these words are certainly technically sufficient to pass an estate in fee in the trees to the grantee, with an indefinite time to enter and remove same. Standing trees are realty under our law. The following citation from a well known authority on real property is in point in this connection:

"But if the owner of lands grants the trees growing thereon to another and his heirs, with liberty to cut and carry

them away at his pleasure forever, the grantee acquires an estate in fee in the trees, with an interest in the soil sufficient for their growth, while the fee in the soil itself remains in the grantor." 1 Washburn Real Property 17.

In *Butterfield Lumber Co.* v. *Gray, supra,* the grantor conveyed his pine timber on certain lands with general warranty. The grantee was given the right to enter and remove said timber. Twenty-four years thereafter the owner of the land brought his suit, alleging that the failure to cut and remove the timber had operated a forfeiture of same. The court held that the language plainly afforded a fee simple title in the timber, without a time limit for removal, and that if the grantor desired to limit the rights of the vendee in any wise, he should have provided the limitation in the contract. This reasoning is essentially sound, and the conclusion derived from the language used is manifestly correct. But the words used in the deed in the instant case, to-wit, "bargain, sell, grant and convey * * *, with covenants of general warranty, the said trees," and the right given "to enter at *any time* on said land to remove the trees," etc., and to "build wagon and other roads to that end," even more plainly than the language construed in the *Butterfield Case, supra,* and in other cases cited, indicate the intent to give a fee simple interest in the trees and the right to remove same without a time limit, or other conditions. Appellees, however, stress the language of a succeeding paragraph in support of their contention that a definite time limit for removal is fixed by the Senter deed. This language is the following: "The party of the second part (*i. e.,* Caroline Harris), or his assigns, are to have ten years from March 10, 1902, in which to cut and remove said trees from said lands, and if the party of the second part, or his assigns, shall fail to cut and remove said trees from said land within ten years from March 10, 1902, then the parties of

the first part, or the then owners of the land, shall have the right to deaden such of said trees as may be standing upon the said land, which the owner may clear for cultivation."

[4] Apparently there is a conflict between the preceding language giving the party of the second part, his heirs and assigns, the right "to enter at any time on said land, to cut and remove the trees," etc., and the language just cited, to-wit: that "the party of the second part, or his assigns, are to have ten years from March 10, 1902, in which to cut and remove said trees," etc. But according to familiar principles we must take the whole contract together, and reconcile, if possible, apparent conflicts between different portions of same, so as to make the instrument, and every part thereof, conform to, and be in harmony with, the manifest general intent.

[5] If this provision as to a ten-year period within which the timber is to be cut and removed was intended to reduce the unlimited right to enter and cut previously given, and to fix absolutely the time within which the standing timber was to be removed, then at the expiration of ten years all trees then standing would be the property of the owner of the land. As this court said in *Blackstone Mfg. Co.* v. *Allen,* cited *supra,* "under a contract allowing a person to cut and remove standing timber within a time specified, absolute title to the timber never passes out of the grantor, until the grantee cuts and removes said timber within the specified period. There is no forfeiture of the timber remaining uncut, or unremoved, after the time limit, for there is nothing to forfeit." That is to say, such uncut, or unremoved, timber has never become in any final sense the property of the grantee. Hence, if the ten year provision cited is designed to fix a precise and definite period within which the timber must be removed, then at the expiration of that period, according to the authority *ubi supra,* though there is no forfeiture, all the uncut, standing timber becomes the

property of the owner of the land. Thereafter the trees will be in all respects subject to his use, disposition and control. He can sell them, and as a matter of course can deaden them, as the greater power inevitably includes the less. In short, he can do what he will with his own. This being so, if the ten year provision is intended definitely to terminate the grantee's interest in, and his relation to, the trees standing at its termination, why was it necessary to give in such precise language to the parties of the first part, *i. e.,* the grantors, or the then owners of the land, "the right to deaden such of said trees as may be standing upon said land, which the owner may clear for cultivation?"

If, as contended, the rights of the grantee of every character, with respect to the standing trees, were to be terminated at the expiration of ten years from March 10, 1902, then thereafter without any specific grant of authority, the owner of the land would be entitled to deaden the standing white oak trees, not only on lands he might desire to clear for cultivation, but on any other lands. Hence, in this view of the words used with relation to the ten year period, the provision with respect to deadening trees thereafter was a nullity, since it undertook to afford a right that the owner of the land would enjoy at that time by virtue of the termination of the grantee's rights. Evidently, however, this provision relating to deadening was not inserted in the deed as a piece of meaningless supererogation, for M. L. Senter who undertakes to say in his deposition that the grantees were intended to be limited to a removal time of ten years, states that after discussing the time for removal, the "talk was that the owner of the land should have the right to deaden after ten years for cultivation." But the query recurs, why should the rights of the owner of the land in respect to deadening be under discussion with the grantee, and be provided for by a specific provision in the deed intended to operate at the expiration of the ten year period

when, according to this witness and the contention of appellees, it was agreed that the rights of the grantee of all sorts, were definitely limited to the ten year period?

Thereafter, the grantors were not concerned to make any agreement with the grantee concerning deadening trees, or the exercise of any authority over the land in question, incident to the ownership of the fee in same. Nor was it necessary for the owner of the land to undertake to derive the authority to deaden trees, or to exercise any other authority over his own property, from a contractee whose rights of every character definitely expired, as contended, at the expiration of ten years from March 10, 1902. Effect and meaning should be given to the deadening provision. As this court said in *Halsey* v. *Fulton,* the president of the court delivering the opinion: "Words deliberately put into a deed, and put there for a purpose, are not to be lightly considered, or arbitrarily put aside. The words in the deed before us were deliberately written in the instrument, are there for a purpose, and are not without meaning." *Halsey* v. *Fulton,* 119 Va. 576, 89 S. E. 913.

The foregoing considerations very plainly indicate that the deadening right was afforded to the grantors, because it was considered that they would not otherwise enjoy it, thereby repelling the contention that the provision as to the ten year period was intended to terminate the grantee's rights and privileges at the expiration of that period. As pointed out, if such a result was intended by the ten year provision, then the explicit grant of the right thereafter to deaden the standing trees on the grantors' lands, was foolish surplusage.

There is another view of the ten year provision which will bring the entire deed in harmony, and give meaning and effect to the deadening clause. The objection usually offered to that construction of a standing timber contract which affords a perpetual right of removal is, that such

construction, with the incidental right to have the trees draw nourishment from the soil, creates a bar to agricultural development, since the lands occupied by standing growing trees will not be available for such development. A very common practice, however, in many mountain counties, is to girdle the larger trees, remove the underbrush and small growth, and then cultivate the land between the dead trees, which no longer either shade or draw nourishment from the soil. Evidently the provision as to the ten year period meant to say that the grantee was given an indefinite and unlimited right to use the grantors' lands for the sustenance of his trees, unless the grantors should desire to clear and devote to agricultural uses any portion of their lands occupied by said timber. With the latter possibility in contemplation the provision was made that at the expiration of ten years a new right, not hitherto, enjoyed, would arise and be enjoyed by the grantors, namely, the right to "deaden such of said trees as may be standing upon said land which the owner may clear for cultivation."

[6] Summarizing the distinguishing features of the deed construed in the instant case, as contrasted with the deed in the case of *Wright* v. *Camp Mfg. Co.*, they are:

(1) The Senter deed conveys, for value, distinct branded trees, while under the deed in the *Camp Case* all the trees growing on the land in question during the deferred period would be the property of the grantee, provided that at the time of cutting they had attained the specified size;

(2) There is practically but little agricultural land embraced in the lands conveyed in the instant case;

(3) Provision was made for the prospective cultivation of this land, if desired, by the deadening clause of the Senter deed.

Having in mind the provisions of the deed in question, and the circumstances under which same was made, the purpose of this deed to afford a perpetual right to enter and remove the trees conveyed is distinctly manifested:

The deed in question, considered as a whole, plainly means:

(a)    That the standing timber was conveyed in fee to the grantee;

(b)    That an indefinite right to remove this timber was afforded;

(c)    That during the period of ten years from March 10, 1902, the grantors were debarred from interfering in any wise with the standing trees, even though they might desire to devote the lands on which they stood to agricultural uses;

(d)    That at the expiration of the ten year period, the rights of the grantors with respect to the standing trees, and the use of the soil, would be enlarged, and the rights of the grantee correspondingly diminished;

(e)    That this enlargement of the grantor's rights was the specific authority afforded after said period to clear the land occupied by the standing trees for agricultural purposes, and to that end to girdle and thereby destroy the vitality of said trees;

(f)    That the grantees were not affected in their right to remove their standing timber by the expiration of the ten year period, but were subject thereafter to a new and superior right afforded the grantors to deaden all timber standing on land desired to be used for agricultural purposes, even though such action might be the cause of damage to the timber;

(g) That as to all lands occupied by standing timber, and not suitable for agricultural purposes, the rights of the grantee would not be affected by the ten year provision. As to such lands the grantee would enjoy the right to have the trees remain untouched, and draw nourishment from the soil until such time as the grantee, in the exercise of her rights, might cut and remove the same.

This interpretation of the deed in question is supported by the situation of the parties, and the circumstances surrounding them. It appears from the evidence that most

of the land on Pound river, particularly that on the north side of the stream, is very rough and steep, and much of it rocky. On the whole, very little of it is suitable for farming. The chief value of this land consisted in the standing timber for which there was no immediate market, owing to lack of transportation facilities. Various projected railroads were under discussion, but it was altogether problematical when and to what points they would be built, if at all. The water-shed of Pound river and its affluents was a very rugged, remote and inaccessible region. When the Senter deed was executed in 1904, the nearest railroad stations were Coeburn and Hellier, the former 25 miles away, and the other across the Cumberland mountain. Heavy oak lumber could not be profitably hauled to either of these stations, nor was it commercially feasible to float such lumber down Pound creek, through the Breaks of Cumberland to the deeper and smoother waters of the Big Sandy. Wilson Brothers later essayed this experiment, with disastrous financial results. Hence, under the conditions depicted, standing timber would be purchased as an investment, and not for immediate severance and removal. It is permissible to buy and hold timber as an investment. In the words of one of the cases cited: "There can be no doubt that a party can buy standing timber with no intention of manufacturing it, and may hold it just as he might buy, or hold, land, if he so frame his contract." Harris looked over a field rich in timber, coal and other minerals, all potential wealth, but of little present value, until markets were made available. Under such circumstances, operations in these potential values would necessarily be chiefly speculative. Owners who were either unable, or indisposed, to wait on the arrival of railroads, or the development of water carriage, were ready to sell for a moderate consideration, presently paid, and to pass a complete title. Speculators, with an eye to the future were ready to buy, provided

the chances of profit were not too remote, or the terms of sale too exacting. Harris was one of these speculative purchasers who believed that the large reserves of white oak timber in Dickenson county would be ultimately profitable, provided he could buy and hold until one or more projected railroads, then on paper, could be built into the timber area. As the time of construction and arrival of these railroads was purely conjectural, a speculative purchaser, exercising sound judgment, would be disposed to balk at limitations upon his right of removal. Naturally he would insist upon a fee simple in the timber, and an indefinite time for removal, unless the terms demanded by the seller were excessive and unreasonable. A seller owning trees on rough and rocky hillsides, unsuitable for agriculture, would not object to giving an indefinite time for removal, provided he could secure his price. With respect to trees standing on small areas suitable for cultivation, the right to deaden branded white oak trees, comparatively few in number to the acre, would sufficiently meet the situation. Hence the insertion of the deadening clause in the deeds taken by Harris from the Senters and others.

M. L. Senter, apparently the only grantor in the Senter deed who is disposed to challenge the right of Wilson Brothers to cut and remove the trees in controversy, undertakes to say that it was understood between him and his brothers and Harris, that "only ten years would be allowed to remove the timber." But he does not explain why, having made this definite agreement, "the talk was," citing his own language, "that the owner of the land should have the right to deaden after the ten years, for cultivation." But if the testimony of this witness is competent, it is completely refuted by that of the witness Harris, who testifies in detail to the preparation of his deeds, the agreements embodied therein, and the underlying reasons therefor. The following citation is from Harris' deposition:

"There was a large amount of very fine white oak timber in Dickenson county. At that time there was no way to remove it to market, as the streams were small, and it was difficult to even float poplar, or cucumber, especially from the head of Pound river and McClure; but believing that the county would ultimately be developed by railroad on account of immense deposits of valuable coal, I decided to buy oak timber and hold it until the railroad was built, and believing it would be a profitable investment, I prepared my contracts of purchase and deeds so as to give practically unlimited time in which to remove the timber. The only reservation set forth in the contracts of sale, and in the deed as well, was a reservation giving the seller of the timber the right to use his land for agricultural purposes, after a number of years set out in the deed, by deadening such trees as might be standing upon the land he cleared, or desired to clear, for agricultural purposes. This feature was decided on after a discussion with those familiar with the country and the conditions obtaining in reference to the land where the timber was sought to be purchased, it being generally agreed that if the owner of the surface had the right to deaden the trees, and use his surface, he would suffer no loss by allowing the trees to remain on other portions of his land indefinitely, as these trees, each and every one of them, were definitely marked, or branded, and the term of years during which they remained on the land would not increase, or decrease, the number of trees sold by the owner of the surface.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"All the land along Pound river, and especially on the north side of the Pound river, is extremely rough, very steep, much of it rocky, in so much that the owners for years previous to the time I purchased the timber tried to sell the timber, and on several occasions the timber and sometimes the land was under option, but on account of the

extreme roughness of the country, no one had purchased much timber along the Pound river up to 1902. But very little of the land was suitable for farming, and on this ac-count I did not think that any, or but little, of the land would ever be cleared.

*Cross-Examination.*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"Q. At the time you bought this timber, you bought it for the purpose of speculating on it, did you not?

"A. I certainly did, and expected to make a profit on it, and contemplated having to hold it for many years."

It may be said in this connection that the suggested bur-den, even upon farming land, supposed to follow upon an indefinite right to remove mature standing timber, when submitted as a reason why a deed should not be construed to afford such a right, is greater in seeming than in reality. The conversion of mature oak timber into lumber cannot be indefinitely postponed in any literal sense. Oak timber does not indefinitely improve. After it becomes ripe, it de-teriorates. Hence, as to oak timber, such as was purchased in the instant case, there is no likelihood that any great period of time would elapse before economic considerations would cause it to be cut and removed by the owner, thereby freeing the land for agriculture, and relieving the soil of burden. This fact eliminates one consideration relied upon to justify the construction that the deed in the case in judgment should be construed to limit the grantee's right to remove his timber to a definite period of ten years.

Another contention of the complainants is that after their initial operations were discontinued, Wilson Brothers aban-doned their claim to the uncut trees, and, as a result of this abandonment, title to said trees has been transferred to said complainants.

[7] On the subject of parol disclaimer of title, this court said in *Southern R. Co.* v. *Gregg:* "Where the legal title is

vested in one, no mere parol disclaimer can divest title.  It has been long settled here that disclaimer of a freehold can only be by deed, or in a court of record." *Southern R. Co.* v. *Gregg,* 101 Va. 317, 43 S. E. 573.  See also cases cited therein.

[8] The evidence of abandonment is far from satisfactory, apart from the testimony of the defendant, F. G. Wilson, and corroborating witnesses.  The credibility of the witness, M. L. Senter, who testifies that Wilson Brothers told him in 1912 and 1913 that they "did not intend to have anything more to do with the timber" is badly shaken by an exhibit in the record.  This contention of abandonment is considered to be supported by the testimony of the treasurer of Dickenson county, Dr. Sutherland, who testifies in relation to the contents of a letter received from Wilson Brothers in 1917 or 1918.  This letter is not produced.  The gravamen of its contents, as stated by Dr. Sutherland, is that the defendants wrote that "they had cut all of their timber in Dickenson county."  F. G. Wilson, testifying for the defendants, denies most positively that they ever had any intention of abandoning the timber owned by Wilson Brothers in Dickenson county.  With respect to the letters of the firm of Wilson Brothers, the witness stated that it was the rule of the firm to keep copies of the same.  He denied that they had written any letter stating that the firm "had cut all of their timber in Dickenson county," and asserted that his letter-files showed no copy of a letter to that effect.  The witness filed a copy of a letter to Treasurer Sutherland, which might have been construed by the latter to bear the meaning which he imputed to it.  This letter was part of a correspondence between the Wilson Brothers and Treasurer Sutherland on the subject of taxes.  The direct testimony of the defendant, F. G. Wilson, on the subject of abandonment is corroborated by a number of witnesses.  One witness for complainants testifies that after

Wilson Brothers suspended their operations, they corresponded with him with reference to cutting the balance of the timber for them.

"Q. You knew that Wilson Brothers intended to cut the balance of the timber that they had on Pound river, and had some correspondence with them, didn't you?

"A. Yes, sir, I did a while after they quit.

"Q. You corresponded with them with reference to cutting it for them?

"A. Yes, sir.

"Q. Then you knew that they still intended cutting this timber, didn't you?

"A. Yes, sir. I 'lowed that was their intention, or they wouldn't have been writing about it."

George Holmes, the agent of the defendant in their logging operations, makes the following answer to a question relating to this alleged abandonment:

"A. No, sir, they didn't talk that way, they talked the opposite way, the last time I talked with them, and Ferdy Wilson, here at Fremont in 1916, he told me then that they were going to abandon any efforts of taking anything down the river, but when conditions would permit they would make some use of this timber, and get it to the railway at Fremont, or any other point they might be able to reach, that is the way Mr. Wilson talked to me about it, and I know he meant it, and subsequent correspondence I have had with them indicates the same thing."

In a letter to the Ritter Lumber Company, of date September 11, 1918, the defendants, referring to their trees in Dickenson county, say: "We have not abandoned the trees, and have paid taxes up to last year.    *  *  *    We, of course, consider these trees more valuable than at the time of purchase."

Apart from the direct testimony to the contrary, it is in the highest degree unlikely that the defendants ever entertained any intention of abandoning the uncut trees. From

the evidence in the record, it appears that when the defendants suspended work on account of the difficulties of transportation, a considerable number of trees were still standing. The railroad was completed to Fremont in the fall of 1915, thereby affording the much desired railroad transportation, as soon as the defendants were in a position to resume operations, after recovery from the losses sustained in the disastrous effort to float their timber down Pound river. According to the witness Holmes, the timber from the Senter tract can be successfully hauled to Fremont, and shipped from that point. Having these things in mind, there is no reason to believe that the defendants would abandon valuable property at a time when there was a reasonable hope that in the comparatively near future they could successfully market same, and recoup the losses which they had sustained. The evidence for the defendants positively disproves the charge of abandonment, and is entitled to far the greater weight.

Upon the whole we conclude that the defendants had a title in fee to the timber in controversy plainly afforded, with no time limit on their right of removal, and that there was no abandonment of the uncut trees. For the reasons heretofore given, the decree of the Circuit Court of Dickenson county, perpetuating the injunction complained of, must be reversed, and the proper final order will be entered in this court.

*Reversed.*